IN THE DISTRICT COURT OF LATIMER COUNTY
STATE OF OKLAHOMA

WAGNER & LYNCH, P.L.L.C. and )
BLAKE LYNCH, )
             )
        Plaintiffs, )
             )
v. )   Case No.: CJ-2017- _12_____
             )
             )
GREAT LAKES INSURANCE SE, and )
JOHNSON CLAIM SERVICE, INC., )
             )
        Defendants. )

FILED IN MY OFFICE AT
Wilburton, Latimer County, Okla.

MAY 3 0 2017

MELINDA BRINLEE
COURT CLERK
By_____Deputy

## PETITION

    COMES NOW the Plaintiffs, Wagner & Lynch, P.L.L.C. and Blake Lynch (collectively "Lynch") and for their causes of action against Defendants Great Lakes Insurance SE and Johnson Claim Service, Inc. allege and state as follows:

### I. Jurisdiction and Venue

    1.    Plaintiff Wagner & Lynch, P.L.L.C. is an Oklahoma professional limited liability company.

    2.    Plaintiff Blake Lynch is a citizen of the State of Oklahoma and a resident of McAlester, Pittsburg County, Oklahoma.

    3.    Defendant Great Lakes Insurance SE ("Great Lakes") is a foreign insurance company with corporate headquarters and principal place of business in Munich, Germany. Great Lakes is licensed to and engaged in the business of insurance in the State of Oklahoma, including Latimer County.

    4.    Defendant Johnson Claim Service, Inc. ("JCS") is a Delaware corporation with its principal place of business in Broken Arrow, Oklahoma.

5.     The real property at issue in this case is located at 123 West Main Street in Wilburton, Latimer County, Oklahoma.

6.     The events which give rise to this lawsuit occurred in Wilburton, Latimer County, Oklahoma.

7.     The District Court in and for Latimer County has jurisdiction over the parties under 12 O.S. §§ 132, 137 and 187.

## FACTS

8.     Lynch hereby adopts and realleges each of the facts and allegations set forth in paragraphs 1-7 above.

9.     Lynch is the owner of real property located at 123 West Main Street, Wilburton, Latimer County, Oklahoma (the "Building"). The Building is a historic structure over one hundred (100) years old that was completely renovated in 2014 by Plaintiff Lynch, an attorney, for use as his law firm's offices and as offices for other business tenants. The Building was located downtown and would also serve as a community gathering space for public functions and use by other Wilburton organizations and businesses.

10.     The Building was insured under a Business Policy issued by Defendant Great Lakes, Policy No. GLP007672, providing policy limits for damage to the Building in the amount of $200,000 and personal property loss in the amount of $50,000.

11.     On July 23, 2016, a fire occurred in the building adjacent and attached to the Building that caused catastrophic damage to the Building. As a result of the fire, the Building was completely inoperable and not suitable for any tenants.

12.     On or about July 25th, the Monday after the fire, Lynch reported the damage to his insurance agent, who contacted Great Lakes on his behalf, to inform it of the fire loss.

13.     A few days later, Lynch was contacted by Randy Howard of JCS, an entity hired by Great Lakes to assist in handling and administering Lynch's claim, regarding the fire loss and to schedule an inspection of the Building. After learning about the extent of the damage, JCS also directed Lynch to begin getting estimates for repairs.

14.     On or about August 1, 2016, JCS conducted a walk-through of the Building to assess the damage. Mr. Howard briefly walked through the space with Lynch and took a few pictures; however, Mr. Howard spent less than twenty (20) minutes to conduct the inspection and did not ask any substantive questions of Lynch about the Building or damage. After the inspection, Mr. Howard only indicated that he would be in touch with Lynch about the claim.

15.     Subsequently, on August 16, 2016, Lynch met with Rick Eller[1] and Floodserv, Inc. ("Floodserv") to get bids for demolition and restoration work. Lynch submitted these bids to JCS and began putting together an inventory of personal property that was destroyed by the fire.

16.     Due to the extensive amount of damage as well as discussions with and approval by JCS, Lynch retained FloodServ to handle the demolition and cleaning so that the Building could be restored. FloodServ's initial estimate was approximately $23,000 for cleaning and general demolition. However, FloodServ made it clear to Lynch during the bidding process that there could be the possibility of additional demolition work beyond the initial estimate due to the amount of damage to the Building.

17.     Then, on August 18, 2016, Lynch received a bid from Air Repair Services of $18,050 to replace the HVAC system, including the ductwork. Air Repair Services determined

---

[1] Mr. Eller, Owner of Eller Paint & Finish, was the original contractor that did the restoration work to the Building in 2014.

that the HVAC system could not be repaired and would have to be torn out. Lynch submitted this bid to JCS.[2]

18. A week or so later, August 30, 2016, Great Lakes made an initial payment of $75,810.97 for the damage to the Building. [Letter from JCS, attached as Exhibit 1].

19. On September 1, 2016, Lynch emailed JCS to confirm what he had discussed with Floodserv that it "did not want to be locked in at that amount since the interior walls are insulated and they don't know how many layers of ceiling/floor there are."[3] [Email, attached as Exhibit 2].

20. After work began on the demolition, on September 7, 2016, Lynch informed JCS that the contractors wanted a structural engineer to inspect the wall adjoining the building where the fire started for structural integrity. Lynch asked JCS if they wanted to retain the engineer or if Lynch should, and when that inspection should be scheduled. [Email, attached as Exhibit 3].

21. JCS approved the hiring of the engineer. Lynch's contractor located EIKON Consulting Group from Sanger, Texas who agreed to perform the inspection for a base fee of $2400.00. Lynch provided this information to JCS; however, the inspection was never performed because Great Lakes never approved or responded to the request.

22. Lynch's September 7, 2016 email also reported to JCS as follows regarding Floodserv:

> Floodserv started work today on the tear down, and indicated they are already running into a need to change their cleanup amount because, since the interior walls are insulated, they are going to have to pull all of the sheetrock which means pulling all of the electrical. So, we need to make sure we're on the same page in regards to amendments on this initial estimate.

---

[2]    Payment to Air Repair Services was included in the November 11, 2016 disbursement from Great Lakes and JCS set forth in paragraph 28 below.

[3]    Due to the extent of the damage, Floodserv ultimately billed $49,289.42 for the demolition.

[Exhibit 3].

23.     Then, on September 14, 2016, Lynch emailed JCS the bid for the reconstruction from Rick Eller in the amount of $176,741.60 for the repairs and restoration work including replacement of the HVAC unit. The bid did not include (and was in addition to) the cleaning and demolition work that was being performed by Floodserv. Lynch also stressed that he had not yet received payment on the personal property inventory, and "desperately" needed payment to be made. Lynch emphasized that he was going to have to set up a temporary office and emphasized that "you have to get this stuff put together and tell me what is going on....Please get in gear on this claim." [Email, attached as Exhibit 4].

24.     Lynch continued to request updates and approval of the bids he submitted both by telephone and by emails. For example, on September 21, 2016, Lynch emailed JCS that:

> Any update? I am trying not to bug you too much, but I have not heard anything since our phone call....You now have all my estimates (with the exception of cleaning the front of the building) and I have heard nothing on those either. I have a personal/business property claim due and I have already had to purchase replacement computers and printer and am going to have to replace supplies very soon. Please give me an update soon.

[Email, attached as Exhibit 5].

Lynch sent another email expressing the same concerns on October 18, 2016:

> [W]hat is the status of the personal property payment? As I've said before we've already had to replace many things and need the money back for those replacements....Additionally, I've given Floodserv 20k to date. So our funds are quickly getting eaten up. Where are we on getting approval for the bids I submitted? Where are we on getting additional funds distributed to begin the process of putting the upstairs back together? I've heard nothing from you on the bids I submitted previously (other than acknowledgement of receipt)....Please let me know.

[Email, attached as Exhibit 6].

25.    On or about November 6, 2016, Lynch also obtained a second bid for the reconstruction from Cape Cod Construction in the amount of $156,824.49. Like the estimate from Rick Eller, the Cape Cod Construction estimate was for repairs and restoration work only and also included replacement of the HVAC unit. This bid also was in addition to the cost of Floodserv's demolition and cleanup work. [Cape Cod Construction Bid, attached as Exhibit 7].

27    On November 8, 2016, Lynch emailed JCS and provided information that Floodserv's work was almost completed and he would be sending an updated bill. Lynch stated that he did not have the funds to start the process of rebuilding, and requested an additional $35,000 - $50,000. Lynch also again requested payment on the personal property. [Email, attached as Exhibit 8].

28.    Finally, on November 11, 2016, JCS sent a Proof of Loss form for the Building and personal property damages to date. The Statement of Loss reflected damages to the Building in the amount of $93,055.97 and business personal property damages in the amount of $20, 565.82, for a total disbursement of $113,021.79. [Letter from JCS, attached as Exhibit 9].

29.    On November 14, 2016, Lynch emailed JCS with an update on the Building status. The email stated in pertinent part that:

> I have $18,922.81 remaining in the account. Work completed to date is the tear down of all materials in the office. You'll be getting an updated statement, but the long and short is that I now have a building that is down to 2x4s in all but one room. Renovation is complete for about 1/3 of the downstairs area. That renovation cost was $30,832.16 to Eller Paint….That was the rental office.

> That is only about 1/7th of the square footage once the stairs and landing are taken into consideration….The area that was completed did not include much plumbing work (there will be some in the other areas because of the complete gutting of 3 bathrooms and a kitchen area) and did not have detailed woodwork in it….Without HVAC work, which I gathered has been approved, I cannot imagine anyway that the rebuild would be less tha[n] $200,000. Even if I can get a bid at $150,000 – which I am trying to do – the remaining funds I have is not even enough to pay a down payment to get materials and work started.…

Please respond with a plan to get some additional funds to me so I can hire someone to get to work on this place.

[Email, attached as Exhibit 10].

30.    In late December 2016 or early January 2017, over six months after the fire, Lynch was informed for the first time that Great Lakes wanted Michael J. Berryman of Berryman Enterprises, Inc. to inspect the property and prepare a bid.

31.    On January 12, 2017, Great Lakes paid an additional $6,419.84 for Lynch personal property loss.

32.    Berryman inspected the Building on January 19, 2017, months after Floodserv had completed the demolition and clean up work, and wrote a report dated February 2, 2017. Without ever inspecting the pre-demolition damage to the Building, Berryman opined that Floodserv had done too much demolition work. Similarly, without inspecting the damaged HVAC system, Berryman opined that the HVAC system could have been cleaned and salvaged, rather than torn out and replaced, Berryman also opined that both of Lynch's contractors' bids were excessive. Berryman estimated that "had the proper scope and procedures been followed" the Building could have been cleaned and repaired for $101,987.42. Berryman estimated the "the scope of the work that will now be required to restore the building considering the extensive demolition that has taken place" to be a total of $182,621.44, including replacement of the HVAC unit. [Berryman Estimate, attached as Exhibit 11].

33.    On January 24, 2017, Lynch contacted JCS regarding the Berryman estimate:

I really really really want to get moved in at some point before summer. I am paying about $900 to office in another location and it is getting old. I have prepaid through April and the contractors both indicate that if they got the job now that they could have me in the first floor by then. But I do not want to wait much longer.

> I've tried to be very diligent in keeping up with my requests and the timelines that we have worked…I cannot imagine anyone saying I have been unreasonable in my request to get the funds to complete my building some 7 months after the incident.

[Email, attached as Exhibit 12].

34.     On February 7, 2017, Lynch again contacted JCS requesting the status of the Berryman estimate.  Lynch stated that:

> I would still like contact for the insurance company to voice my complaints regarding the delays their 3rd party estimate are causing me.  They could have ordered that months ago and probably saved me the trouble of having to get people out to do estimates.

[Email, attached as Exhibit 13].

35.     The Berryman report was sent to Lynch by letter dated February 23, 2017.  JCS informed Berryman that, because the parties could not agree on a repair amount, Great Lakes was invoking the Appraisal Condition of the policy, in which an umpire selected by the appraisers for each party makes the determination.  [Letter from JCS, attached as Exhibit 14].

36.     The February 23 letter also enclosed a supplemental claim payment of $25,176.45, for a total amount paid to Lynch of $144,618.08.  No additional payments have been made.  [Exhibit 14].

## FIRST CAUSE OF ACTION – BREACH OF CONTRACT
### (Great Lakes)

37.     Lynch hereby adopts and realleges each of the facts and allegations set forth in paragraphs 1- 36 above.

38     Lynch is entitled to payment of his full policy limits for the damage to his Building, which Great Lakes has refused to pay.  Great Lakes also did not inform or pay benefits owed to Lynch when the Building was inoperable due to damage and he was forced to obtain a temporary office.

39.   Great Lakes' unreasonably low offer of payment and refusal to fully compensate Lynch for the loss is a denial of the benefits due and owing under the insurance contract.

40.   Therefore, Great Lakes has breached the contract of insurance.

41.   As a direct and proximate result of Great Lakes' breach of the insurance contract, Lynch has suffered damages in excess of $10,000.

## SECOND CAUSE OF ACTION – BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### (Great Lakes)

42.   Plaintiff hereby adopts and realleges each of the facts and allegations set forth in paragraphs 1-41 above.

43.   As an insurance company licensed to do business in the State of Oklahoma, Great Lakes is bound by Oklahoma statutory and common law to honor its contractual obligations to its insureds in good faith.  As such, Great Lakes has and continues to have a duty to deal fairly and in good faith with Lynch, its insured.

44.   Great Lakes breached its duty to deal fairly and in good faith with Lynch by failing to conduct a full, fair and unbiased investigation into the nature and extent of the damage to Lynch's Building, and failing to offer policy limits when the evidence supported payment of the policy limits.

45.   Great Lakes failed to assist Lynch in the handling of the claim, even though Great Lakes knew Lynch was losing money and could not operate the law firm or accommodate his office tenant in the Building.

46.   Great Lakes unreasonably relied on Berryman to undervalue Lynch's claim and to intentionally dispute evidence that only weighed in favor of payment of policy limits on the claim.

47.    Great Lakes disregarded its responsibilities to Lynch in favor of its own profitability and put its own interests ahead of those of Lynch.

48.    As a result of Great Lakes' breach of its duty to deal fairly and in good faith, Lynch has suffered damages in excess of $75,000.

49.    Great Lakes' breach of the duty of good faith and fair dealing was intentional and malicious.

50.    Punitive damages should be awarded against Great Lakes in an amount sufficient to punish Great Lakes and deter others.

## THIRD CAUSE OF ACTION – BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### (JCS)

51    Plaintiff hereby adopts and realleges each of the facts and allegations set forth in paragraphs 1-50 above.

52.    Under the circumstances of this case, JCS stepped into the shoes of Great Lakes and performed many of its responsibilities with regard to Lynch, including the investigation, evaluation and payment of the claim for both the damage to the Building and the personal property.

53.    JCS was sufficiently entangled with Great Lakes in this case that it owed Lynch the same duty of good faith and fair dealing as did the insurer.

54.    JCS breached its duty to deal fairly and in good faith with Lynch by failing to conduct a full, fair and unbiased investigation into the nature and extent of the damage to Lynch's building, and failing to offer policy limits when the evidence supported payment of the policy limits.

55.     JCS failed to assist Lynch in the handling of the claim, even though JCS knew Lynch was losing money and could not operate the law firm or accommodate his tenant in the building.

56.     JCS unreasonably relied on Berryman to undervalue Lynch's claim and to intentionally dispute evidence that only weighed in favor of payment of policy limits on the claim.

57.     JCS put its own interests ahead of those of Lynch.

58.     JCS's breach of the duty of good faith and fair dealing was intentional and malicious.

59.     Punitive damages should be awarded against JCS in an amount sufficient to punish JCS and deter others.

WHEREFORE, Plaintiffs Wagner & Lynch, P.L.L.C. and Blake Lynch pray for judgment against Defendants Great Lakes Insurance and Johnson Claim Service, Inc. for an amount in excess of $75,000, together with costs, interest, reasonable attorney fees, and other relief which this Court deems just and equitable.

Respectfully submitted,

Simone Fulmer, OBA #17037
Harrison C. Lujan, OBA #30154
Jacob L. Rowe, OBA #21797
Andrea R. Rust, OBA #30422
FULMER GROUP PLLC
1101 N. Broadway Ave., Suite 102
P.O. Box 2448
Oklahoma City, OK 73103
Phone/Fax:    (405) 510-0077
Email: sfulmer@fulmersill.com
hlujan@fulmersill.com
jrowe@fulmersill.com
arust@fulmersill.com

**ATTORNEYS FOR PLAINTIFF**

**ATTORNEY LIEN CLAIMED**
**JURY TRIAL DEMANDED**

# JCS JOHNSON CLAIM SERVICE, INC.

August 30, 2016

Wagner & Lynch, LLC
109 E. Washington
McAlester, OK 74501

**VIA EMAIL**

ATTN:  Blake Lynch
       blake.e.lynch@gmail.com

RE:   Policy # –            GLP007672
      Date of Loss –        7/23/16
      Company Claim # –  GL002016
      Our File # –          73030

Dear Mr. Lynch:

Enclosed you will find a Proof of Loss form, reflecting settlement of the building damage for the above captioned claim.  Please have our appropriate company representative sign the Proof of Loss form and have their signature notarized.  A copy of the executed form can be faxed or emailed to expedite handling, however, we request the <u>original</u> be returned to our office by mail.

We have also enclosed a copy of the estimate of repair on the basis of which settlement is being made.  You may keep this documentation for your records.

We are continuing efforts to document your Business Personal Property loss.   That damage will be addressed under separate cover.

Should you have any questions regarding the enclosed documents, please feel free to contact our office.

Sincerely,

Randy Howard, AIC

RH/kh

cc:   Great Lakes RE (UK) SE
      c/o Jaeger + Haines, Inc.

EXHIBIT
1

## SWORN STATEMENT IN PROOF OF LOSS

$ 250,000.00
AMOUNT OF POLICY AT TIME OF LOSS

GLP007672
POLICY NUMBER

6/4/16
DATE ISSUED

Cashmere Agency
AGENT

6/4/17
DATE EXPIRES

McAlester, OK
AGENCY AT

To the     Great Lakes RE (UK) SE

of     London, England

At time of loss, by the above indicated policy of insurance you insured     Wagner & Lynch, LLC
123 W. Main, Wilburton, OK 74578

against loss by     fire     to the property described under Schedule "A," according to the terms and conditions of the said policy and all forms, endorsements, transfers and assignments attached thereto.

1. **Time and Origin:** A     fire     loss occurred about the hour of _____ o'clock _____ .M.,
on the   23   day of     July     2016 The cause and origin of the said loss were  fire damage to the building

and business personal property.

2. **Occupancy:** The building described, or containing the property described, was occupied at the time of the loss as follows, and for no other purpose whatever:     Commercial Building

3. **Title and Interest:** At the time of the loss the interest of your insured in the property described therein was: shared
No other person or persons had any interest therein or

incumbrance thereon, except: The Bank NA

4. **Changes:** Since the said policy was issued there has been no assignment thereof, or change of interest, use, occupancy, possession, location or exposure of the property described except: none

5. **Total Insurance:** The total amount of insurance upon the property described by this policy was, at the time of the loss, $250,000.00 as more particularly specified in the apportionment attached under Schedule "C," besides which there was no policy or other contract of insurance, written or oral, valid or invalid.

6. The Total Replacement Cost of said property at the time of the loss was _ _ _ _ _ _ _ _ _ _ _ _ _ _ $ _____

7. **Actual Cash Value** of said property at the time of the loss was _ _ _ _ _ _ _ _ _ _ _ _ _ _ $ 76,810.97

8. **The Whole Loss and Damage was** . _ _ _ _ _ _ _ _ _ _ _ _ _ _ $ 76,810.97

9. **The Amount Claimed** under the above numbered policy is _ _ _ _ _ _ _ _ $ 1,000.00 deductible _ _ _ _ _ _ _ $ 75,810.97 *
*Settlement of Building damages.  Business Personal Property claim is pending.

The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of its rights.

**"WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony."**

State of _____          X _____

County of _____          X _____ Insured

Subscribed and sworn before me this _____ day of _____ 20 ___

_____ Notary Public

**From:** Blake Lynch [mailto:                    ]
**Sent:** Thursday, September 01, 2016 6:35 AM
**To:** Randy Howard
**Subject:** Books, settlement language, etc.

Floodserv is starting on Tuesday of next week. I have to move out things that aren't getting destroyed - do I need to hold on to the items in the personal property list or are you going to have approval on what to do with them before then? If I have to hold them what am I supposed to do with them? Rent storage? Is that covered?

Also, your cover letter indicated this is a settlement and doesn't do much to describe what we discussed - which is that this is not final and that the total may change. When I spoke to floodserv they recalled that they did not want to be locked in at that amount since they may have to remove sheet rock since the interior walls are insulated and they don't know how many layers of ceiling/ floor there are. Long story short - I want conformation that this is NOT a final amount, this is just me accepting this amount as YOUR initial estimate BEFORE we begin demo so we can get started and is subject to change.

Please reply to both TODAY, Thursday September 1st so I can sign and return the documentation you sent by the end of the day.

Blake Lynch

This email and any attachments are CONFIDENTIAL and may contain legally privileged information. If you are not the intended recipient of this email message, please notify us by return e-mail immediately, delete this message from your system and do not read, copy, distribute, disclose or otherwise use this email message and any attachments. Although Johnson Claim Service, Inc. believes this email and any attachments to be free of any virus or other defect that may affect your computer, it is the responsibility of the recipient to ensure that it is virus free and Johnson Claim Service, Inc. does not accept any responsibility for any loss or damage arising in any way from its use.



EXHIBIT

2

---------- Forwarded message ----------
From: **Blake Lynch** <                                    >
Date: Wed. Sep 7, 2016 at 5:20 PM
Subject: Engineer
To: Randy Howard <                                    >

EXHIBIT

3

My contractors are wanting to have a structural engineer look at the wall that adjoined the building that
burned up to make sure that it will still stands and be okay once that other building is torn down, also,  to
figure out what kinds of remediation we'll have to do on the outside of the wall that will be exposed to the
elements for the first time. My question is twofold: 1. Do you want me to hire this person or do you want to

hire this person? 2. Do we need to hire this person to make sure this building is going to stand before we get much deeper into the clean up process.

Floodserv started work today on the tear down, and indicated they are already running into a need to change their cleanup amount because, since the interior walls are insulated, they are going to have to pull all of the sheetrock which means pulling all of the electrical. So, we need to make sure we're on the same page in regards to amendments on this initial estimate. The only way this work is going to be done in any timely fashion is if we can avoid having payment delays like we did with the initial payment. Whatever I need to do to speed up this process, please let me know. The contractors who did the initial work are doing bids to redo the work once floodserv is finished. I should have those to you by the beginning of next week. Please, give me a call or reply to my email tomorrow so I can know how we're doing.

Sorry to be such a bother.

Blake

---------- Forwarded message ----------
From: **Blake Lynch** <                    >
Date: Wed. Sep 14, 2016 at 9:47 PM
Subject: Fwd: Raunikar office est and start and big office estimate
To: Randy Howard <                           >

This is the estimate for the rest of the building. Clearly, without even including the clean up costs we are exceeding the limits of the policy. I am going to try to get them down, but with about $35k in clean up (Flood serv is amending based on conditions), $30k for Nils office that only leaves $185k on the policy. That means getting them down $37k on their bid. Obviously that doesn't include the personal property that I DESPARATELY need a decision on. The longer this takes the more my expenses go up. I am going to be spending 3k to set up a temp office and paying $600 a month for temp space. Not to mention utilities at 2 places, loss of business, etc. I realize you have a hard job, but you HAVE to get this stuff put together and tell me what is going on. I have been exceedingly patient based on my circumstances, but that is wearing thin. I am fully aware of the duties to settle claims in a timely fashion and the industry standard for doing so. I am aware, as are you, that failure to do that increases my damages. I am aware, as are you, that there

EXHIBIT

4

are liability questions that come up when we don't settle claims in good faith and in a timely fashion. PLEASE get in gear on this claim. This is a COMPLETE gut and rebuild job. It would have been cheaper for you all if it had burned, I get that, but I can't help it.

I have sent you info on the proposed engineer. I would hate to get deep in this and find out that there is a structural problem. But I will proceed on without that is what you want, but I am documenting EXTENSIVELY that I have TRIED to get you all to get someone to look how the tear down next door and smoke damage will effect the structure. If you force me to proceed without it by denial or simple failure to acknowledge and reply I am telling you that I AM NOT ACCPETING liability for damages if this thing falls down.

There is no latent threat here. My intentions are manifest and obvious. If you cannot get the insurance company to get to work then I will make sure that I do what I have to do to mitigate damages as I can and I will pursue said insurance company for damages caused by these continued delays. You seem to be a nice guy and I am sorry if they are the ones putting you in the middle of this.

From: **Blake Lynch** <blake.e.lynch@gmail.com>
Date: Wed, Sep 21, 2016 at 2:39 PM
Subject: Insurance
To: Randy Howard <rhoward@johnsonclaimservice.com>

Any update? I am trying to not bug you too much, but I have not heard anything since our phone call. I have received no approval for funds om hiring an engineer so we did not. You now have all my estimates (with the exception of cleaning the front of the building) and I have heard nothing on those either. I have a personal/business property claim due and I have already had to purchase replacement computers and printer and am going to have to replace supplies VERY soon.

Please give me an update soon.

--
Blake E. Lynch
Attorney at Law
Wagner & Lynch

Wilburton Office
123 West Main
P.O. Box 310
Wilburton, OK 74578
918-465-5544

McAlester Office
109 East Washington
McAlester, OK 74501
918-421-8843
918-421-8853 (fax)


EXHIBIT
5

From: **Blake Lynch** <blake.e.lynch@gmail.com>
Date: Tue, Oct 18, 2016 at 12:56 PM
Subject: Follow up
To: Randy Howard <rhoward@johnsonclaimservice.com>

Well, it's Tuesday and I've tried to leave you alone for a little bit, but I'd like some info.
1) what is the status of the personal property payment? As I've said before we've already had to replace many things and need the money back for those replacements.
2) the first part of the office will be done this week (referred to as nils office or Raunikar office or rental space in the bids). That's cost about 33k total to get done. Additionally, I've given flood serv 20k to date. So our funds are quickly getting eaten up. Where are we on getting approval for the bids I submitted? Where are we on getting additional funds distributed to begin the process if putting the upstairs back together? I've heard nothing from you on the bids I submitted perviously (other than acknowledgment of receipt).

I guess those are the only two things right now. Please let me know.

Blake

EXHIBIT

6



# Cape Cod Construction

**412 Etchison**
**Quinton, Ok 74561**
**Phone: (918) 695-8617  Fax: (918) 469-2953**
**E-Mail: Thomas.cass1988@gmail.com**

Date: 11/6/16

Owner's Name: Blake Lynch

Job Address: Warner office

Total Bid:  $156,824.49

Bid Includes:

- Material and labor for Primer to seal material from smoke damage and to clean the exterior of the building. $7,000.00
- Materials and Labor for insulation foam in rafters and interior walls back to original condition of 6" on exterior walls and ceiling. Batting for interior walls.  $20,000.00
- Replacement of materials lost to fire for electrical and plumbing with labor to install to include replacing lighting substantially similar to, but less expensive than original lighting (customer has approved suggested lighting) includes LED bulb replacement. Bathroom fixtures and kitchenette fixtures and cabinets replaced with the same or similar as was previously installed.  $10,000.00
- Material and labor for drywall and bead board.  $25,000.00
- Material and labor on replacing and installing all doors and windows and refinishing all "old" or "antique" doors.  $10,000.00
- Material and labor to paint interior of building with 2 coats.  $25,000.00.
- Material and Labor to install flooring. Approximant 3,985 sq. ft. of flooring at 37,538.70
- Material and Labor to install trim. Including wainscoting to comparable condition to original.  $10,000.00
- 8.5% contractors fee of $12,285.79.

Contractors Notes: Any changes in material may increase bid.
All Bids are subject to change on visual inspection of house



EXHIBIT

7

2

Contractor Signature: _____ Date:_____

CCLH Signature: _____ Date:_____

From: **Blake Lynch** <blake.e.lynch@gmail.com>
Date: Tue, Nov 8, 2016 at 8:27 AM
Subject: Claim update
To: Randy Howard <rhoward@johnsonclaimservice.com>, Valerie Cashmere
<vcashmere@farmersagent.com>

Randy,
I've included my agent in case she might be able to help things along.

1) floodserv is almost done. Should be done this weekend and will get you an updated bill.
2) I'm working on getting you 2 specific quotes in a format like what floodserv did
3) I am still holding this rug. If you guys want it feel free to take it, but either way I need to move it
4) I don't have sufficient funds to start the process of rebuilding - since we can agree that the original
amount is not going to cover the rebuild, can I get an apportionment of like 35-50k to start the rebuild?
5) I need payment on the personal property. My impression is that you've had the information long enough
to get me payment for the items we've aged on and destroyed (which is everything but 1 rug)

Please follow up with a reply all today if possible.

Blake



EXHIBIT
*8*

# JCS  JOHNSON CLAIM SERVICE, INC.

November 11, 2016

Wagner & Lynch, LLC
109 E. Washington
McAlester, OK 74501                    **VIA EMAIL**

ATTN:  Blake Lynch
        blake.e.lynch@gmail.com

RE:     Policy # –           GLP007672
        Date of Loss –       7/23/16
        Company Claim # – GL002016
        Our File # –         73030

Dear Mr. Lynch:

Enclosed you will find a Proof of Loss form, reflecting settlement of the Building and Business Personal Property damages for the above captioned claim.

Please have your appropriate company representative sign the Proof of Loss form and have their signature notarized. A copy of the executed form can be faxed or emailed to expedite handling, however, we request the original be returned to our office by mail.

We have also enclosed a General Release form regarding the loss sustained by Amanda Littlejohn. Please have Ms. Littlejohn sign the General Release form and have her signature notarized. A copy of the executed form can be faxed or emailed to expedite handling, however, we request the original also be returned to our office by mail.

Enclosed is a copy of the Statement of Loss, estimate of repair, and Inventory of Items forms on the basis of which settlement is being made. You may keep these documents for your records.

Should you have any questions regarding the enclosed documents, please feel free to contact our office.

EXHIBIT
9

2

Sincerely,

Randy Howard, AIC

RH/kh

Enclosures

cc:   Great Lakes Reinsurance (UK) SE
      c/o Jaeger + Haines, Inc.

## SWORN STATEMENT IN PROOF OF LOSS

$ 250,000.00

AMOUNT OF POLICY AT TIME OF LOSS

GLP007672

POLICY NUMBER

6/4/16

DATE ISSUED

Cashmere Agency

AGENT

6/4/17

DATE EXPIRES

McAlester, OK

AGENCY AT

To the __Great Lakes Reinsurance (UK) SE__

of __London, England__

At time of loss, by the above indicated policy of insurance you insured __Wagner & Lynch, LLC__
123 W. Main, Wilburton, OK 74578

against loss by __fire__ to the property described under Schedule "A," according to the terms and conditions of the said policy and all forms, endorsements, transfers and assignments attached thereto.

1. Time and Origin: A __fire__ loss occurred about the hour of _____ o'clock _____ .M.
on the __23__ day of __July__ __2016__ The cause and origin of the said loss were __fire damage to the building__
__and business personal property.__

2. Occupancy: The building described, or containing the property described, was occupied at the time of the loss as follows, and for no other purpose whatever: __Commercial Building__

3. Title and Interest: At the time of the loss the interest of your insured in the property described therein was: __shared__
No other person or persons had any interest therein or incumbrance thereon, except: __The Bank NA__

4. Changes: Since the said policy was issued there has been no assignment thereof, or change of interest, use, occupancy, possession, location or exposure of the property described except: __none__

5. Total Insurance: The total amount of insurance upon the property described by this policy was, at the time of the loss, $ __250,000.00__ as more particularly specified in the apportionment attached under Schedule "C," besides which there was no policy or other contract of insurance, written or oral, valid or invalid.

6. The Total Replacement Cost of said property at the time of the loss was - - - - - - - - - - - - - - $ _____

7. Actual Cash Value of said property at the time of the loss was - - - - - - - - - - - - - - - - - - $ __113,860.79__

8. The Whole Loss and Damage was - - - - - - - - - - - - - $ __113,860.79__

9. The Amount Claimed under the above numbered policy is _____ $ __1,000.00__ deductible $ __112,860.79__  *

*Payment for Building damages in the amount of $75,810.97, has been previously issued.

The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of its rights.

**"WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony."**

State of _____     X _____

County of _____     X _____ Insured

Subscribed and sworn before me this _____ day of _____ 20 _____

_____ Notary Public

## STATEMENT OF LOSS

**INSURED:**                 Wagner & Lynch, LLC
**DATE OF LOSS:**       7/23/2016
**POLICY #:**             GLP007672
**COMPANY FILE #:**  GL002016
**OUR FILE #:**        73030

| COVERAGE | ACV LOSS | POL. LIMIT | CLAIM |
|---|---|---|---|
| **BUILDING** | $ 93,055.97 | $ 200,000.00 | $ 93,055.97 |
| **BUSINESS PERSONAL PROPERTY** | $ 20,404.82 | $ 50,000.00 | $ 20,404.82 |
| *PROPERTY OF OTHERS | $ 161.00 | $ 2,500.00 | $ 161.00 |
| VALUABLE PAPERS & RECORDS | $ 400.00 | $ 1,000.00 | $ 400.00 |
| **TOTAL LOSS** | $ 114,021.79 | | $ 114,021.79 |
| **DEDUCTIBLE** | $ (1,000.00) | | $ (1,000.00) |
| **NET CLAIM** | $ 113,021.79 | | $ 113,021.79 |
| **PREVIOUS ACV SUBMITTED** | | | $ (75,810.97) |
| **PENDING ACV SUPPLEMENT** | | | $ 37,210.82 |

**COINSURANCE:**
BPP insured to value

**COMMENTS:**
*Personal Property owned by Amanda Littlejohn, Administrative
Assistant for the insured.

---------- Forwarded message ----------
From: **Blake Lynch** <                    >
Date: Mon. Nov 14, 2016 at 11:20 AM
Subject: Paperwork/Check/Update RESPONSE REQUESTED
To: Randy Howard <                              >, Valerie Cashmere
<                    >

I still have not been emailed the forms I need to sign for the business personal property and HVAC or the forms for Amanda to sign on her lost contents.

I still need to know what to do with this rug. I would like to have Floodserv get rid of it so we don't have additional disposal costs.

Here's the update after all payments on completed work are done.

I have $18,922.81 remaining in the account. Work completed to date is the Tear down of all materials in the office. You'll be getting an updated statement, but the long and the short is that I now have a building that is down to 2x4s in all but one room. Renovation is complete for about 1/3 of the downstairs area. That renovation cost was $30,832.16 to Eller Paint. All of that has been paid and that work is completed. That was the rental office. I did lose 4 months of rent in the downtime. I'm giving you notice on that in case it is relevant in the future.

Attached is the Eller Invoice.

That is only about 1/7th of the square footage once the stairs and landing are taken into consideration. This does NOT include cleaning up the outside of the building or doing anything with the windows upstairs. The area that was completed did NOT include much plumbing work (there will be some in the other areas because of the complete gutting of 3 bathrooms and a kitchen area) and did not have detailed woodwork in it (the other areas of the office had a custom chair rail from reclaimed lumber that had to be tossed - the replacement with an equivalent will be more expensive that a typical wall, but less than if we had to replace with the same material). WITHOUT HVAC work, which I gathered has been approved, I cannot imagine ANY way that the rebuild would be less that $200,000. Even if I can get a bid at $150,000 - which I am trying to do - the remaining funds I have is not even enough to pay a down payment to get materials and work started. You have one estimate for the rebuild, I'm trying to get a second, but I need to know what the plan is. In rent alone I am out an additional $750 a month PLUS I am paying the mortgage on this place. The fact that my stay off site is getting extended because of delays in appropriations for repairs is cause for concern.

Please respond with a plan to get some additional funds to me so I can hire someone to get to work on this place.

EXHIBIT
16



**Berryman**
426 N.W. 5ᵀᴴ
Oklahoma City, OK 73102
Off: (405) 235-4646
Fax: (405) 235-3311
E-mail: bbean@berrymanokc.com

February 2, 2017

Don McGrath, CPCU, ARM, AIC
Senior Claims Examiner
E & S Claims Management, Inc.
2110 Sunset Hills Road Suite 320
Reston, Virginia 20190

RE:   **Wagner & Lynch**
      **123 West Main Street**
      **Wilburton, Oklahoma 74578**
      **Claim#: GL002016**
      **Policy #: GLP007672**
      **Berryman Project No. 17-01-10E**

Dear Mr. McGrath:

On January 19, 2017, we traveled to the above referenced property in order to determine the extent of property damages resulting from a fire that occurred on 7/23/16. The fire started in the adjacent building, 127 West Main, which resulted in smoke damage to the risk, located at 123 West Main. We measured the individual interior rooms for quantification purposes, photographed the interior, and reviewed the claim file materials that were provided to us. We reviewed various estimates issued by: Johnson Claim Service; FloodSERV; Eller Painting; and Cape Cod Construction.

The following report details a summary of our review, observations and conclusions and is based on observable data. The inspection was of a non-destructive nature and involved no materials testing. This report is provided for the sole use of *E & S Management, Inc.* and/or its representatives. The following report can be changed only in writing by the undersigned and is subject to modification should additional information become available.



EXHIBIT

11

Wagner & Lynch
Wilburton, Oklahoma

## QUALIFICATIONS

I have been a general contractor since 1978 and have performed numerous property restoration projects for owners whose building structures have sustained damages caused by fire. I routinely examine structures for the extent of sustained damages and submit construction proposals to the public for a property's restoration. In the regular course of business I estimate the construction cost and outline the scope of work that is an integral part of my firm's offers to contract for needed property restoration. I interface with insurance professionals in the course of business and have developed a keen understanding of the customary means, methods and pricing for the restoration of damaged real property.

## BACKGROUND

I reviewed the file documents and learned the following information:

- FloodSERV (FS) submitted a cleaning/demolition estimate, dated 8/9/16, which totaled $23,125.47.

- Randy Howard with Johnson Claim Service (JCS) developed a restoration estimate, dated 8/10/16, which totaled $76,810.97. JCS adopted the FS cleaning estimate and the cost for this work was included in the JCS estimate.

- The owner received a proposal from Air Repair Services, dated 8/18/16, which totaled $18,050 to replace the HVAC systems, including ductwork. Air Repair Services maintain the HVAC system could not be cleaned or repaired and the entire system required replacement.

- JCS included the cost submitted by Air Repair Services in their revised estimate, dated 10/24/16, which now totaled $94,860.97.

- FS submitted a supplemental estimate, dated 11/11/16, which totaled $49,289.42, including the $23,125.47 cleaning estimate amount previously presented on 8/9/16. This revised estimate included hourly rates for demolition labor. No back-up documents were provided to substantiate the increased labor costs. According to Randy Howard, FS performed this supplemental work without his knowledge and/or without his approval.

- JCS adopted the revised FS estimate and the cost for this work was included in the revised estimate, dated 12/8/16, which totaled $187,542.48.

Wagner & Lynch
Wilburton, Oklahoma

- Mr. Lynch received an estimate for restoring the building from Cape Cod Construction (CC), dated 11/6/16, which totaled $156,824.49. This estimate was to perform the build back only and did not include demolition.

- Mr. Lynch also received a building restoration estimate from Eller Paint, dated 12/5/16, which totaled $176,741.60. This estimate was for the build back only and did not include demolition. It did include the HVAC replacement.

## OBSERVATIONS/OPINIONS

- The risk was affected by smoke that transferred through the masonry demising wall between the risk and the point of origin, 127 West Main. Based upon photography and file documents, the smoke fallout on the floors was slight. Some "smoke blowout" was noted at the baseboards along the shared wall areas, only.

- The initial FloodSERV (FS) estimate for $23,125.47 represents a close approximation of what was required for the cleaning and demolition at this loss. However, some items were omitted. For instance, the removal of subflooring at the second level to access the removal of batt insulation at the floor cavity between the first and second levels. Any omitted items could have been added in the typical process of consulting with the adjuster and reaching an agreed-upon additional scope and price as the work progressed.

- The initial JCS estimate, $76,810.97, was the appropriate scope of work to replace the demolition items outlined in the initial FS demo estimate.

- After work began, FS expanded their scope of work, significantly. Their final estimate of $49,289.42 essentially "gutted" the first and second level of all architectural finishes including sheetrock walls/ceilings, cabinets, some doors, etc. Based upon our observations and experience, this unnecessarily expanded the project scope of work and pricing, not only for their demolition but for the overall build-back of the project. It should be noted that it appears that this scope expansion was outside the industry standard protocol of reaching an "agreed upon scope and price" with the adjuster before commencing work.

- The FS $49,289.42 estimate is based upon time and material, yet there are no back-up source documents to support the billing. We are suggesting that this information be provided by them for our examination.

Wagner & Lynch
Wilburton, Oklahoma

- Air Repair Services opined that the HVAC system could not be cleaned or repaired and the entire system required replacement. We believe that a second opinion should have been obtained before the decision was made to demolish the furnaces and ductwork. Based upon our direct experience, it is unlikely that light smoke could not have been cleaned from the system with professional methods.

- The building is still occupied by a tenant located in the first two (2) offices immediately inside the storefront. These offices are located up against the demising wall shared between the risk and the point-of-origin. They were not gutted, but instead were cleaned and restored using the scopes of work that were originally contemplated in the original FS and JCS estimates, respectively. It should be noted that these two (2) offices appear fully restored. They are in full operation and have no residual smoke odor. This evidence further supports the notion that the building could have been restored using a continuation of the original scope, albeit with some likely additions, in lieu of the scope expansion and "gutting" of the building as was subsequently adopted by FS.

- . The Eller Paint estimate is excessive and goes beyond what will be required to restore the damages. For instance, it includes:

  - Vertical and horizontal sconce lighting.
  - Furnish and install (1) chandelier.
  - Replacing (16) ceiling fans.
  - Replacing (6) vinyl windows.

- The Cape Cod estimate is excessive and goes beyond what will be required to restore the damages. For instance, it includes:

  - Replacement of lighting fixtures (smoke, when present, usually can be cleaned from lighting fixtures and does not necessitate their replacement).
  - Bathroom and kitchen fixtures (smoke, when present, can be cleaned from impervious fixtures).
  - Replacement of windows.

- We utilized the informational database supplied by Xactware for Muskogee, Oklahoma for August 2016 to develop two (2) cost estimates to restore the damage. Exhibit A, attached, outlines the scope of work that we believe was required to fully restore the building structure had the proper scope and procedures been followed. The estimate totals $101,987.42 and includes all required demolition, cleaning and re-building. The HVAC system would be cleaned and not replaced in this scenario.

- We have also provided an estimate, attached as Exhibit B. Exhibit B, $182,621.44, outlines the scope of work that will now be required to restore the building considering the extensive demolition that has taken place.

Wagner & Lynch
Wilburton, Oklahoma

Page 5 of 5
Berryman Project No. 17-01-10E

Exhibit B includes that appropriate market cost of the demolition and cleaning that has already been performed (approximately $22,000 in value) and the cost to fully restore the demolished HVAC at $18,050.00.

Thank you for the opportunity to be of service in this matter. Please feel free to contact me should have any questions.

Sincerely,

Michael J. Berryman
BERRYMAN ENTERPRISES, INC.

Attachments: Estimate

cc:   file

---------- Forwarded message ----------
From: **Blake Lynch** <blake@wagnerandlynch.com>
Date: Tue, Jan 24, 2017 at 9:29 AM
Subject: Update on claim
To: rhoward@johnsonclaimservice.com, vcashmere@farmersagent.com

I called and left a message as well. I am wondering if you have info back from the Berryhill guys. I really really really want to get moved in at some point before the summer. I am paying about $900 a month to office in another location and it is getting old...I have prepaid through April and the contractors both indicate that if they got the job NOW that they could have me in the first floor by then. But I do not want to wait much longer.

I've tried to be very diligent in keeping up with my requests and the timelines that we have worked...I cannot imagine anyone saying I have been unreasonable in my request to get the funds to complete my building some 7 months after the incident.

Please let me know the status today.

Blake

EXHIBIT

12

---------- Forwarded message ----------
From: **Blake Lynch** <blake@wagnerandlynch.com>
Date: Tue, Feb 7, 2017 at 12:00 PM
Subject: RE: Status Questions
To: Randy Howard <rhoward@johnsonclaimservice.com>, Valerie Cashmere
<vcashmere@farmersagent.com>

And also, as we discussed, I would still like contact info for the insurance company to voice my complaints
regarding the delays their 3rd party estimate are causing me. They could have ordered that months ago and
probably saved me the trouble of having to get people out to do estimates.
Blake

EXHIBIT
13
tabbies



CLAIM CENTER

3103 S. Juniper Avenue
Broken Arrow, OK 74012
(918) 455-3900
Fax: (918) 455-7460

February 23, 2017

Wagner & Lynch, LLC
109 E. Washington
McAlester, OK 74501

**SENT VIA REGISTERED EMAIL**
**and REGULAR U.S. MAIL**

ATTN: Blake Lynch
blake.e.lynch@gmail.com

RE:     Policy No. –          GLP007672
        Date of Loss –        7/23/16
        Company Claim # –  GL002016
        Our File No. –        73030

Dear Mr. Lynch:

We continue to represent Great Lakes Insurance SE (formerly known as Great Lakes Reinsurance (UK) SE), hereinafter referred to as "Great Lakes" with regard to the above captioned matter. You have presented a claim for fire damage and we have been assigned for investigation and handling of this matter.

On behalf of Great Lakes, you received settlement documentation from our office, reflecting the known covered Actual Cash Value damages in the amount of $119,441.63 (which included $161.00 paid to Amanda Littlejohn) and a Proof of Loss form has been signed and returned. Payments for the known covered damages have been issued.

Great Lakes requested further inspection of the building by a Building Consultant, Berryman Enterprises, Inc. Enclosed is a copy of their report and estimate. In accordance with Berryman Enterprises, Inc.'s findings, you will also find enclosed a supplemental claim payment for an undisputed amount of $25,176.45.

An estimate of repair has been provided by your contractor FloodSERV which appears to be excessive. As an agreed cost of repairs has not been reached, Great Lakes will be invoking the Appraisal Condition of the policy, regarding this claim and all damages related to the occurrence. Please be advised that Great Lakes' chosen Appraiser is Berryman Enterprises, Inc.

For clarification of policy provisions, we refer you to pages 1 and 4 of your CP00 10 10 91 policy form, **BUSINESS AND PERSONAL PROPERTY COVERAGE FORM.** You will note the following:



EXHIBIT
14

2

**A.    Coverage**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

**1.   Covered Property**

Covered Property, as used in this Coverage Part, means the following types of property form which a Limit of Insurance is shown in the Declarations:

a. **Building,** meaning the building or structure described in the Declarations, including:

(1) Completed additions;

(2) Permanently installed:

(a) Fixtures;

(b) Machinery; and

(c) Equipment;

(3) Outdoor fixtures;

(4) Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

(a) Fire extinguishing equipment;

(b) Outdoor furniture;

(c) Floor coverings; and

(d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

(5) If not covered by other insurance:

(a) Additions under construction, alterations and repairs to the building or structure;

(b) Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

b. **Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property – Separation of Coverage form:

(1) Furniture and fixtures;

(2) Machinery and equipment;

(3) "Stock";

(4) All other personal property owned by you and used in your business;

(5) Labor, materials or services furnished or arranged by you on personal property of others;

(6) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

(a) Made a part of the building or structure you occupy but do not own; and

(b) You acquired or made at your expense but cannot legally remove;

(7) Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property of Others.

3

c. **Personal Property of Others** that is:

   (1) In your care, custody or control; and

   (2) Located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

   However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

E.    **LOSS CONDITIONS**

   2.   **Appraisal**

        If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

        a. Pay its chosen appraiser; and

        b. Bear the other expenses of the appraiser and umpire equally.

        If there is an appraisal, we will still retain our right to deny the claim.

Please advise who your Appraiser will be so Berryman Enterprises can work with that individual to select an Umpire. Great Lakes' reference to the above stated Provision(s) is not to be construed as a waiver of any other policy provisions and/or conditions. Great Lakes does not waive other provisions, limitations, exclusions or conditions of the involved insurance policy, but rather specifically reserves them. All rights, defenses and privileges afforded Great Lakes under the policy and at law are hereby expressly reserved on their behalf.

We anticipate and thank you for your prompt reply.

Sincerely,

Randy Howard
918-455-3900
rhoward@johnsonclaimservice.com

RH/kh

Enclosures
Berryman report and estimate

4

cc:    Great Lakes Insurance SE
       c/o Jaeger + Haines, Inc.
       Attn:  Cathy Campbell
       c.a.campbell@jplush.com

       Cashmere Agency
       1421 N Main Street
       McAlester, OK 74501

       Berryman Enterprises
       Attn:  Mike Berryman
       bbean@berryman@okc.com

       E & S Claims Management, Inc.
       Attn:  Don McGrath
       donald.mcgrath@eandsclaims.com

1129

Vanguard Federal Money
Market Fund

**JAEGER & HAINES, INC.**
P.O. BOX 1623
FAYETTEVILLE, AR 72702-1623

DATE _____ 02/15/2017 _____ 82-22/311

PAY TO THE ORDER OF _ Wagner & Lynch, LLC and The Bank NA _____ $ ***25,176.45

******************25,176** DOLLARS AND 45 CENTS **************** _____ DOLLARS

Payable through WFB, N.A.
Wilmington, DE

NOT VALID FOR LESS THAN $250.00

CLAIM # GL002016; 3146/2016;
DOL: 07/23/16; POL: GLP007672
FOR __ INSURED: Wagner & Lynch, LLC __